UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-308(DSD/JMM)

Northland Insurance Companies,

Plaintiff,

v. **ORDER**

Patrick Blaylock,

Defendant.

Michael J. McGuire, Esq., Raphael T. Wallander, Esq. and Rider, Bennett, Egan & Arundel, 2000 Metro Center, 333 South Seventh Street, Minneapolis, MN 55402, counsel for plaintiff.

Paul A. Ledford, Esq. and Saliterman & Siefferman, 1000 Northstar Center East, 608 Second Avenue South, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court on plaintiff's motion for a preliminary injunction or alternatively for default judgment for defendant's alleged failure to abide by the parties' stipulation, and defendant's motion for dismissal under Rule 12(b)(6) for failure to state a claim.

For the reasons stated herein, the court denies the motion to dismiss, denies the motion for default judgment, and denies the motion for a preliminary injunction.

SEP 26 2000
FILED
FRANCIS E. DOSAL, CLERK
Judgment Ent'd.
Deputy Clerk's Initials

## BACKGROUND

While the details of the underlying insurance coverage dispute between plaintiff and defendant is of limited relevance to the present claims, a basic overview may facilitate an understanding of how the current matter arose.

Defendant Patrick Blaylock owned a yacht that he insured with plaintiff. In May 1998, defendant's yacht was damaged. Defendant subsequently filed an insurance claim seeking reimbursement for alleged losses of $23,441.75.

A dispute over this claim escalated into litigation between the parties. Defendant sued plaintiff in conciliation court in California. Defendant prevailed, but his damage award was limited to the $5,000 jurisdictional limit of the conciliation court. Defendant subsequently sought payment from plaintiff for the remaining $17,341.75 of his original claim - an amount that he construes to have been "wrongfully denied" and reflective of "the unfair treatment he received at the hands of Northland Insurance Company." (Def.'s Supplemental Mem. Opp'n Prelim. Inj. at 1.)

Following the conclusion of the conciliation court case, and based upon what he perceived to be plaintiff's unfair business practices, defendant created two Internet web sites to house complaints and criticism of plaintiff's business. The first, at issue in this dispute, bears the domain name "northlandinsurance.com" and was registered with Network Solutions,

Inc. ("NSI") on or about August 29, 1999. Defendant also registered a second domain name "sailinglegacy.com" on or about September 3, 1999. Defendant admits that the first domain name was specifically selected "to make his site more easily found by web surfers" who may be interested in Northland Insurance Company. (Def.'s Mem. Supp. Mot. to Dismiss at 17.) Defendant contends, however, that the purpose of this site is to showcase to an Internet audience his own experiences with plaintiff, his commercial commentary and criticism of plaintiff's business practices, and to provide a forum for other "victims" of the plaintiff to air their complaints of mistreatment.[1]

At this first web site, the Internet user sees line one which reads in small type font "Northland Insurance, Associates First Capitol, Yacht Insurance, Boat Insurance, Auto Insurance, Trucking Insurance, Business Insurance" and then below in larger and bolder font "Northland Insurance Companies ... Another Opinion! ... If you feel you have been ABUSED at the hands of Northland Insurance please click the link above. You're not alone." (McGuire Decl.,

[1] Defendant explained in a letter to plaintiff dated September 20, 1999, "[t]his site will be both strategically and hugely linked for the purpose of sharing our experiences at the hands of Northland Insurance. The Internet is not the national nighttime news but it is highly focused. I will not limit the linking to Yacht Insurance. We will solicit other victims of Northland Insurance, Co. to post their Northland experiences and documents. ... I plan on placing small cost-effective ads in sailing publications inviting boat owners to share my experiences. Communication can be powerful; Northland should try it sometime." (Sutherland Decl., Ex. O.)

Ex. B.) The user is then directed to the second web site that describes in detail defendant's complaints about the plaintiff, an extensive history of his legal dispute, his correspondence with plaintiff, and provides other links including a link to defendant's attorney in this matter.

Plaintiff contends that the name "Northland Insurance" is a protected mark and defendant's use of it as his domain name violates trademark laws and the recently enacted federal Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (Supp. 2000). Plaintiff instituted this action alleging trademark infringement, dilution, unfair business practices, and a claim under the ACPA. Plaintiff now moves for a preliminary injunction or alternatively for default judgment based upon defendant's alleged failure to abide by the parties' stipulation to extend defendant's time to answer the complaint. Defendant moves for dismissal under Rule 12(b)(6) for failure to state a claim.

## DISCUSSION

### I. Defendant's Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) provides that a party may move to dismiss a complaint where the complaint does not state a cause of action upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, the court takes all facts alleged in plaintiff's complaint as true. See Westcott v.

City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). Further, the court must construe the allegations in the complaint and reasonable inferences arising from the complaint in the light most favorable to the plaintiff. See Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). The court will dismiss a complaint only when it appears plaintiff cannot prove any set of facts that support the claim. See Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

As discussed below, while the court concludes that there is an insufficient factual basis upon which to grant a preliminary injunction, the court does not similarly conclude that plaintiff's claims fail to state causes of action upon which relief can be granted.[2] This is not "the unusual case in which a plaintiff includes allegations that show on the face of the complaint that

[2] As a preliminary matter, the court notes that parties have submitted with their responsive pleadings several affidavits which purport to describe in greater detail the defendant's conduct and the response of the plaintiff. "[A]ny written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings" constitutes "matters outside the pleadings." Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992). When matters outside the pleadings are presented on a Rule 12(b)(6) motion and are not excluded by the court in determining the Rule 12(b)(6) motion, the court must convert the motion to one for summary judgment. See Fed. R. Civ. P. 12(b)(6). Because this lawsuit is in its earliest stages, the court believes a motion for summary judgment is premature and will disregard the affidavits submitted by plaintiff for purposes of this Rule 12 (b)(6) motion and treat this matter as a motion to dismiss on the pleadings. However, the court will consider these affidavits in evaluating plaintiff's motion for a preliminary injunction.

there is some insuperable bar to relief." See Frey, 44 F.3d at 671 (quoting Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974)). Thus, defendant's motion for dismissal under Rule 12(b)(6) is denied.

## II. Plaintiff's Motion for Default Judgment

Plaintiff moves for default judgment on grounds that defendant failed to comply with a stipulation between the parties extending the time period for defendant's answer.[3] Because defendant did not file an "Answer" but rather filed a motion to dismiss under Rule 12(b)(6), plaintiff argues that defendant has breached the stipulation and default judgment should be entered.

Plaintiff's highly technical argument sidesteps Rule 12(b) of the Federal Rules of Civil Procedure, which provides that a party may file either a 12(b)(6) motion or an answer in conformity with the Rules. Moreover, the rule provides that "[a] motion making any one of these defenses [including 12(b)(6)] *shall be made before* pleading if further pleading is permitted" [emphasis added]. Fed. R. Civ. P. 12(b). When a motion to dismiss has been filed, no answer need be filed until ten days after the court disposes of the motion. See Charles Allan Wright & Arthur R. Miller, Federal

[3] On March 1, 2000, the parties stipulated to grant defendant an extension of time to answer plaintiff's complaint The relevant language of the stipulation provided, "[plaintiff and defendant] hereby stipulate and agree that the date by which Defendant must file and serve his Answer to Plaintiff's Complaint shall be extended ...". (McGuire Decl., Ex. B.)

Practice and Procedure, § 1346 (3d ed. 1992) (citing Jones v. Bales, 58 F.R.D. 453 (D. Ga. 1972), aff'd, 480 F.2d 805 (5th Cir.)(holding plaintiff not entitled to default judgment when defendant did not file an answer but instead filed Rule 12 motion within time limit for response)); Rudnicki v. Sullivan, 189 F. Supp. 714 (D. Mass. 1960) (holding that service of motion under 12(b)(6) by defendant stopped the running of time period to file an answer, and defendant was not in default).

While defendant did not strictly abide by the precise language of the stipulation agreement to file an "Answer," the court finds that the defendant did "answer," both in the broader sense of this word and under the requirements of the Federal Rules of Civil Procedure. Accordingly, the court denies plaintiff's motion to dismiss.

**III. Plaintiff's Motion For Preliminary Injunction**

The court considers four factors in determining whether to grant a motion for preliminary injunction:

1. Is there a substantial threat that the movant will suffer irreparable harm if relief is not granted;

2. Does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the nonmoving parties;

3. Is there a substantial probability that the movant will prevail on the merits; and

4. The public interest.

Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The court balances the four factors to determine whether injunctive relief is warranted. See id. at 113; West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987). The movant bears the burden of proof concerning each of them. See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

**A. The Threat of Irreparable Harm**

Plaintiff must first establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages. See In re Travel Agency Com'n Antitrust Litig., 898 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury."). Possible or speculative harm is not enough. See Graham Webb Int'l v. Helene Curtis, Inc., 17 F. Supp. 2d 919, 924 (D. Minn. 1998). The absence of such a showing alone is sufficient to deny a preliminary injunction. See Gelco, 811 F.2d at 420; Roberts v. Van Buren Pub. Schs., 731 F.2d 523, 526 (8th

Cir. 1984). The court concludes that the record at this preliminary stage is devoid of any evidence or demonstration of irreparable harm.

Plaintiff asserts it will suffer irreparable harm if a preliminary injunction is not granted because Internet users are likely to presume that the domain name, "northlandinsurance.com," belongs to plaintiff and upon visiting that site become frustrated and fail to continue on to plaintiff's actual web site, "northlandins.com". Plaintiff thus far has not made a sufficient showing of this perceived harm, and the court finds this presumption of irreparable harm unpersuasive.

Plaintiff also argues that it does not need to establish irreparable harm because where there is a trademark infringement, the law presumes that irreparable harm exists. In Mutual of Omaha Ins. Co. v. Novak, the Eighth Circuit noted in a footnote that:

> [i]n trademark infringement, it is not necessary for plaintiff to prove actual damage or injury to obtain injunctive relief.... Injury is presumed once a likelihood of confusion has been established.... All that the complaining party must do to establish its right to an injunction is to prove the likelihood of confusion.

836 F.2d 397, 403 n.11 (8th Cir. 1988). See also General Mills Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987) ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it

appears that [plaintiff] can demonstrate a likelihood of consumer confusion.").

Therefore, the critical determination at this preliminary stage is whether, in the absence of proof of actual harm, plaintiff has demonstrated a showing of likelihood of confusion. As detailed below, plaintiff at best has shown that a factual question exists concerning the likelihood that Internet users will be confused by the competing Internet domain names involved in this case and at worst has failed to establish any likelihood of confusion as a result of defendant's alleged infringement.

The court therefore concludes that plaintiff will not be irreparably injured absent a preliminary injunction. While this holding alone is sufficient to deny the injunctive relief sought, the court will also discuss the remaining Dataphase factors. See Baker Elec. Coop, Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) ("No single factor in itself is dispositive ... [h]owever, a party moving for preliminary injunction is required to show the threat of irreparable harm." (internal quotation and citation omitted); Gelco, 811 F.2d at 420 ("Once a court determines that the movant has failed to show irreparable harm absent an injunction, the inquiry is finished and the denial of the injunctive request is warranted.").

**B. The Balance of Harm Between the Parties**

The second Dataphase requirement is that the harm to plaintiff in the absence of a preliminary injunction outweighs the potential harm that granting a preliminary injunction may cause to defendant. Dataphase, 640 F.2d at 114. The essential inquiry in weighing the equities is whether the balance tips decidedly toward the movant. See General Mills, 824 F.2d at 624.

Plaintiff has failed to make a specific showing of the damages it will incur if a preliminary injunction is not granted. Plaintiff makes broad statements of the irreparable harm it will suffer due to the possibility that consumers will confuse the differing web sites, but plaintiff has not proffered any evidence of a decrease in Internet traffic or sales of its products, or evidence of customer confusion as to the existence of defendant's Internet site. By contrast, the court is concerned that a preliminary injunction would inflict substantial harm on the defendant since the potential curtailment of his First Amendment rights itself constitutes an irreparable injury. See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Therefore, the court concludes that the balance of harms weighs against the preliminary injunction.

**C. The Likelihood of Success on the Merits**

Under the third Dataphase requirement, plaintiff must establish a substantial probability of success on the merits. Dataphase, 620 F.2d at 114. Plaintiff raises multiple claims, none of which, at this preliminary stage, appear likely to succeed on the merits.

**1. Common Law Trademark Infringement**

In order to prevail on its common law trademark infringement claim, plaintiff must show that: (1) it has a protectable mark; (2) it has priority of use of that mark, and (3) defendant's subsequent use of that mark is likely to cause confusion. See General Mills, 824 F.2d at 626. Plaintiff's failure at this stage of the lawsuit to demonstrate a likelihood of confusion is dispositive here.

The likelihood of confusion test is the "hallmark of any trademark infringement claim." Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 80 (2d Cir. 1994). The Eighth Circuit has consistently considered six factors in determining whether a likelihood of confusion exists: (1) the strength of the owner's trademark; (2) the similarity between the parties' marks; (3) the products' competitive proximity; (4) the alleged infringer's intent to pass off its goods as those of the trademark owner in adopting the mark; (5) incidents of actual confusion; and (6) the type of product, its cost, the conditions of purchase, and the degree of care to be

exercised by potential customers of the trademark holder. See General Mills, 824 F.2d at 626; Mutual of Omaha, 836 F.2d at 399; Squirt Co. v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980). No single factor is dispositive. See Mutual of Omaha, 836 F.2d at 399 n.3 ("These are not necessarily the only factors that might be relevant in a particular case. The ultimate inquiry always is whether, under all the circumstances, there exists a likelihood of confusion between the plaintiff's trademark and the allegedly infringing use.").

Marks are protected against "any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by the trademark owner." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:6 (4th ed. 1998). The court sees no evidence at this preliminary stage that any reasonable member of the buying public would be likely to conclude that defendant's web site is affiliated with, connected to, sponsored by, or otherwise comes from the plaintiff. It is immediately apparent that defendant's site bears no relationship to plaintiff's business other than as a source of consumer criticism of plaintiff's business. In other words, there is no indication that any reasonable person who was seeking plaintiff's services via the Internet would mistake defendant's site as being affiliated with or sponsored by plaintiff. Furthermore, since defendant's site offers

no competitive products nor solicits any commercial activity, there is little likelihood that it can reasonably be inferred likely to harm plaintiff's business through even the slightest consumer confusion. The court finds little evidence at this stage of litigation to support a finding of likelihood of confusion sufficient to warrant the issuance of a preliminary injunction.

The court will, nonetheless, briefly examine each of the aforementioned six factors:

**a. Strength of Trademark**

Whether a mark is entitled to protection is initially approached by categorizing the mark as generic, descriptive, suggestive, or arbitrary. General Mills, 824 F.2d at 625. These terms have specific meanings and a mark is entitled to varying protection depending on its classification:

> A mark is designated as generic in recognition of its role in consumer minds as the common descriptive name for a type, genus, or class of goods, ... and such a mark is precluded from trademark protection under any circumstances.... A descriptive mark, on the other hand, designates characteristics, qualities, effects or other features of a product and can be protected only if shown to have become distinctive through acquiring secondary meaning.... Suggestive marks, requiring imagination to reach a conclusion as to the product's nature, and arbitrary marks, which are inherently distinctive, are entitled to broad trademark protection without establishing secondary meaning.

Id. (citations omitted). See also Duluth News-Tribune, Northwest Publishers, Inc. v. Mesabi Publ'g Co., 84 F.3d 1093, 1096 (8th Cir. 1996) (defining generic, descriptive, suggestive, and arbitrary marks).

Plaintiff argues that its mark is arbitrary, citing to North Star State Bank of Roseville v. North Star Bank Minnesota, 361 N.W.2d 889, 895 (Minn. Ct. App. 1985), in which the Minnesota Court of Appeals concluded that the term "North Star," when used with the term "Bank" created an arbitrary term for purposes of trademark law since the term "North Star" has no relation to the services offered by the bank.[4] An arbitrary mark is one that uses "words, symbols, pictures, etc. that are in common linguistic use but which, when used with the goods and services in issue, neither suggest nor describe any ingredient, quality or characteristic of these goods or services." McCarthy, supra, § 11:11.

The court agrees with plaintiff that nothing in the term "Northland" suggests insurance, thus, the court finds that the mark is arbitrary. See Northern Wire & Cable, Inc. v. Great Northern Wire & Cable, Inc., 2 U.S.P.Q.2d 1139 (E.D. Mich. 1986) ("Northern" is not geographically descriptive of wire and cable, and thus is

---

[4] Defendant argues that plaintiff's mark is merely a descriptive trade name and therefore entitled to limited protection. A descriptive mark designates characteristics, qualities, effects, the nature, or function of a product. See Duluth News-Tribune, 84 F.3d at 1096. Here, defendant contends the mark reflects a geographic description of plaintiff's services.

arbitrary and does not need secondary meaning for protection); Atlantic Monthly Co. v. Frederick Ungar Publ'g Co., 197 F. Supp. 524 (S.D.N.Y. 1961) (geographical term Atlantic when used for books and magazines was arbitrary, not descriptive); Kraft Gen. Foods, Inc. v. BC-USA, Inc., 840 F. Supp. 344 (E.D. Pa. 1993) (Philadelphia for cream cheese is arbitrary because city of Philadelphia is not known for cream cheese).

Since the court concludes that the term "Northland" is arbitrary, the mark is inherently distinctive and merits broad trademark protection, and this factor favors plaintiff's position.

**b. Similarity Between Marks**

Plaintiff correctly contends that both marks as used in this dispute are identical. The fact that defendant adds the ".com" to plaintiff's mark is irrelevant. Courts have consistently held that the use of a trademark is not abrogated by incorporation into a domain name. See Northern Light Technology v. Northern Lights Club, 97 F. Supp. 2d 96, 110 (D. Mass. 2000). This factor also favors plaintiff's position.

**c. Products' Competitive Proximity**

Plaintiff argues that the Web sites are in close competitive proximity because they are both on the Internet and both are vying for the attention of Internet users. Plaintiff also argues that competitive proximity may be reflected through the consumer's "initial interest confusion." Some courts recognize a brand of

consumer confusion called "initial interest confusion" which permits a finding of a likelihood of confusion although the consumer is only initially confused and quickly becomes aware of the source's actual identity. See Planned Parenthood Fed'n of Am. Inc. v. Bucci, 1997 WL 133313, at *12 (S.D.N.Y. Mar. 24, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998), cert. denied, 525 U.S. 834 (1998) (describing initial interest confusion). But see Teltech Customer Care Management, Inc. v. Tele-Tech Co., 977 F. Supp. 1407, 1414 (C.D. Cal. 1997) (finding no likelihood of confusion existed when plaintiff "only demonstrated an initial confusion on the part of web browsers using the [plaintiff's] domain name ... but [instead] finding the Defendant's website. This brief confusion is not cognizable under the trademark laws.").

This "initial interest confusion" has been described as a "bait" and "switch" by infringing producers to impact the "buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers." Dorr-Oliver Inc. v. Fluid Quip Inc., 94 F.3d 376, 382 (7th Cir. 1996).

The court finds plaintiff's argument here unpersuasive. The Eighth Circuit has not addressed the doctrine yet, but the caselaw that plaintiff cites for the "initial interest confusion" doctrine is notably distinguishable from the present matter. In the instances where courts have found "initial interest confusion" as

an indicator of the "likelihood of confusion" element of trademark infringement, the courts have also found that the defendant had a commercial incentive or motive in using plaintiff's mark to attract "initial interest." That is, "initial interest confusion" existed when the defendant stood to materially or financially gain from said initial confusion by trading in on the value of plaintiff's mark to initially attract customers.

For example, plaintiff relies heavily on the Planned Parenthood case to support its argument that "initial interest" confusion is sufficient to demonstrate a likelihood of confusion. While the facts in Planned Parenthood appear at first blush to be similar, the court notes that defendant stood to benefit commercially on two bases: (1) defendant was using the "bogus" web site to further sales of a book; and (2) defendant's nonprofit anti-abortion group stood to commercially benefit through the solicitation of funds by diverting users from plaintiff's site. Planned Parenthood, 1997 WL 133313, at *5. In addition, there was evidence in the record to demonstrate that Internet users were being diverted from visiting Planned Parenthood's web site. Id., at *4. Based on that evidence, the court determined that defendant's actions were commercially harming plaintiff. Id., at *4("one witness explained 'we didn't resume the search [for plaintiff's web site] after finding defendant's'"). Here, the court cannot make similar conclusions based upon the limited

record. Other cases cited by plaintiff are similarly distinguishable. See OBH, Inc. v. Spotlight Magazine, Inc., 86 F. Supp. 2d 176, 176 (W.D.N.Y. 2000), and Brookfield Communications, Inc. v. West Coast Entertainment Corp. 174 F.3d 1036, 1036 (9th Cir. 1999). In OBH, Inc. v. Spotlight Magazine, Inc. , the court determined that defendant's web site infringed on plaintiff's name because it contained a hyperlink connecting users to defendant's commercial web site. The court concluded that, "Defendants are using plaintiff's trademark, at least in part, to offer their own goods and services over the Internet." OBH, 86 F. Supp. 2d at 186. Likewise, in Brookfield Communications, Inc. v. West Coast Entertainment Corp., defendant stood to commercially gain by his infringing use of plaintiff's trademark, and the court there determined, "a sizeable number of consumers who were originally looking for [plaintiff's] product will simply decide to utilize [defendant's] offerings instead." Brookfield, 174 F.3d at 1062. These cases all differ from the present one in that there was evidence before the court of the commercial gains that defendants were likely to receive from the initial interest confusion of Internet users.

In this case, defendant does not appear to be situated to benefit financially or commercially from the existence of this web site, which appears to be solely intended to capture the attention of insurance consumers to share defendant's commercial commentary

and criticism. See Bally Total Fitness Holding Corp. v. Faber, 29 F. Supp. 2d 1161, 1168 (C.D. Cal. 1998) (holding that defendant's use of plaintiff's trademark in web site dedicated to consumer criticism of plaintiff was not commercially beneficial to defendant and was a permissible use). In other words, while defendant may arguably be trying to "bait" Internet users, there is no discernable "switch".

Plaintiff argues that there are two indicia that demonstrate how defendant stands to commercially benefit from his use of this domain name: (1) that an inference can be made from defendant's correspondence that he had a commercial motivation in registering this domain name;[5] and (2) that defendant has an implicit

---

[5] The record indicates that Mr. Blaylock first informed plaintiff of his acquisition of the domain name in a letter dated September 20, 1999. (Sutherland Decl., Ex. O.) In that letter, defendant wrote plaintiff acknowledging payment of the conciliation court's judgment of $5,026 and indicating that he believed they should pay him the remaining $17,341.75 of the original insurance claim. Id. In this same letter defendant posed the following question, "[w]ho owns the Internet domain, Northlandinsurance.com?" Id. Defendant registered the "northlandinsurance.com" domain name on August 29, 1999. Defendant contends that he did not bring his registration of the domain name to plaintiff's attention to solicit a sale but rather "for the purpose of letting them know that I was out there telling people about what [they] did to my wife and I." (Blaylock Aff. ¶ 6.) On January 12, 2000, defendant wrote plaintiff's parent company, Associates First Capitol Corporation, explaining under the heading, "Northland Insurance Behaving Badly," that, "[t]he purpose of our web site is to expose Northland's questionable business practices in an attempt to save others heartache and financial loss." (Sutherland Decl., Ex. N.) On February 2, 2000, plaintiff's counsel offered defendant $3,500 to sell the domain name. (Prieto Decl. ¶ 4.). Defendant refused the offer and according to plaintiff responded that this figure "way (continued...)

commercial motivation in that he sought to divert potential customers from plaintiff's Internet site through the use of this domain name thereby commercially harming plaintiff's ability to conduct business via the Internet.[6]

The court cannot at this preliminary stage and from the limited record before it, draw such broad inferences. At best, plaintiff has demonstrated a dispute to be determined by the trier of fact. Thus, absent further evidence, the court concludes that

---

[5](...continued) undervalued" the domain name. Id. Both parties concede that the next day defendant sent an e-mail to defendant's general counsel referencing this conversation. The subject line of this e-mail included: "The Domain Name Northland Insurance.com Pricing" and the message stated in part, "The link below should aid in your pricing thought process, based on current trends, your offer to purchase northlandinsurance.com for $3,500 seams [sic] a tad low." (Sutherland Decl., Ex. Q.) The link to which defendant referred was a link to a story on the MSNBC Web site regarding the sale of two domain names: "loans.com" for $3 million and "business.com" for $7.5 million. (Sutherland Decl., Ex. R.) Plaintiff contends this is evidence of Mr. Blaylock's intent to sell this cite. Defendant denies this and contends that this e-mail was not to be taken as a request for higher payment but only as an intention to reject the company's offer. (Blaylock Aff. ¶ 7.) Defendant further argues that there is no specific reflection in the record that he ever contemplated selling this domain name to plaintiff. Defendant states that he has never asked plaintiff to pay for the web site. (Blaylock Aff. ¶ 6.) The court concludes that this evidence is insufficient to draw an inference of defendant's intent to commercially benefit from the use of this web site At best, an issue of fact exists here to be determined at a later stage of this litigation.

[6] Plaintiff cites to the Planned Parenthood decision to support this argument for "negative" commercial impact. See Planned Parenthood, 1997 WL 133313, at * 5. As the court has noted above, Planned Parenthood is distinguishable from the present facts.

the "initial interest confusion" doctrine is not applicable here as a reflection of the likelihood of confusion.

Similarly, the court cannot conclude that plaintiff and defendant's products are in competitive proximity, since plaintiff and defendant do not commercially compete.

**d. Defendant's Intent To Pass Off His Goods As Plaintiff's**

Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent itself is not an element of infringement. Squirt Co., 628 F.2d at 1089. As discussed above, the record at this stage of the litigation does not support the determination that defendant is attempting to pass off any goods or services as plaintiff's. Plaintiff points to defendant's candid admission that he selected this domain name as a "hook" to attract Internet users who were searching for plaintiff's web site. While defendant may intend to use the domain name here to attract Internet users interested in plaintiff's business, this does not equate with an attempt to pass off any type of commercial services or goods as being those of plaintiff.

**e. Incidents of Actual Confusion**

Plaintiff has also failed to produce any evidence of actual confusion. It should be noted that while actual confusion is not essential to a finding of infringement, its existence is positive proof of the likelihood of confusion. See Squirt Co., 628 F.2d at

1091. Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 626 (6th Cir. 1998) ("[T]he lack of evidence of actual confusion is not significant unless the circumstances indicated that such evidence should have been available."). Since defendant's web site has been in existence for over a year, plaintiff has had ample time to assemble such evidence if available. Absent such evidence, the factor does not favor plaintiff.

**f. Other Considerations**

Finally, the court considers such factors as the type of product involved, its cost, the conditions of purchase, and the degree of care to be exercised by potential customers in making their purchasing decision. See Squirt Co., 628 F.2d at 1091. The court concludes that insurance is the type of product that implicitly reflects a high degree of consumer care when making purchasing decisions. Furthermore, the purchaser of insurance services is apt to exercise an even higher degree of care when using the Internet to attempt to reach plaintiff's business. The likelihood that such a consumer would consider defendant's site to legitimately be associated with plaintiff's business is unconvincing. See Champions Golf Club Inc. v. The Champions Golf Club Inc., 78 F.3d 1111, 1120 (6th Cir. 1996) (explaining that a court must inquire into whether buyers would accidentally purchase

other company's product and whether sophisticated purchaser might be confused as to affiliation).

At bottom, "[t]he ultimate inquiry is whether, considering all the circumstances, a likelihood of confusion exists that consumers will be confused about the source of the allegedly infringing product." Hubbard Feeds Inc. v. Animal Feeds Supplement Inc., 182 F.3d 598, 602 (8th Cir. 1999). Likelihood of confusion is synonymous with a probability of confusion, which is more than a possibility of confusion. Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 543 (5th Cir. 1998). Here, given the inherent differences in the nature of these web sites, any reasonable Internet user would readily ascertain that defendant's site is not affiliated with or sponsored by plaintiff. Any likelihood of confusion is relatively minimal absent a more specific demonstration of factual evidence to the contrary. Therefore, even though plaintiff can demonstrate a mark strong enough to warrant protection under the common law of trademark infringement, the court finds that at this stage of the proceedings plaintiff has failed to show a sufficient likelihood of confusion among consumers to justify the issuance of a preliminary injunction.

**2. Dilution Claims**

Plaintiff alleges that defendant's use of the mark violates the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. Sec. 1125(c) (1999), and the Minnesota state anti-dilution statute, Minn.

Stat.§ 333.285 (1998). Plaintiff must show five elements to support a claim of dilution: (1) plaintiff's mark must be famous; (2) plaintiff's mark must be distinctive; (3) defendant's use must be a commercial use in commerce; (4) the use must have occurred after the plaintiff's mark has become famous; and (5) the use must cause dilution of the distinctive quality of plaintiff's mark. See OBH, 86 F. Supp. 2d at 192. Noncommercial use is excepted under the statute. See 15 U.S.C. Sec.1125(c)(4)(B) (1999) (providing that noncommercial use of a mark is not actionable under the FTDA); see OBH, Inc., 86 F. Supp. 2d at 192; see Michael A. Epstein, Epstein on Intellectual Property § 7.06 (4th ed. 1999) ("The noncommercial use exception 'is intended to prevent courts from enjoining constitutionally-protected speech.' [citations omitted]. According to Senator Orrin Hatch ... '[T]he bill [would] not prohibit or threaten noncommercial expression such as parody, satire, editorial or other forms of expression that are *not part of a commercial transaction*.'[citations omitted]"[emphasis added]); see McCarthy, supra, § 24:97.2 ("the intent of Congress seems to be that the federal anti-dilution law cannot be used as a legal riposte to uses of trademark in negative product reviews in the media, or negative opinions expressed about company policies.").

Defendant argues that plaintiff cannot bring a claim under the anti-dilution statutes because dilution requires "commercial use"

by defendant. Defendant points out that his use is for noncommercial communicative purposes.

Plaintiff counters that defendant's acts constitute a commercial use because: (1) defendant is trying to commercially gain from the use of this domain name, and (2) defendant's use of this domain name implicitly affects plaintiff's commercial activities by interfering with its ability to attract customers via the Internet. Plaintiff again relies heavily upon the "initial interest confusion" doctrine and several similar, yet notably distinguishable, cases.[7]

As discussed above, any inference of defendant's commercial motives or intentions to commercially impact plaintiff's business is speculative absent further proof. Thus, even if the court concludes that the plaintiff's mark is famous and distinctive for purposes of this statute, there is no indication of commercial use. On the basis of the present record, defendant's use is for noncommercial commentary purposes. Defendant correctly contends that his use is exempt because it constitutes noncommercial speech. Therefore, the court finds that plaintiff is unlikely to prevail on the merits of the FTDA claim.

Since the Federal and State anti-dilution statutes are construed on similar grounds, the court concludes for the same reasons that plaintiff's claim under Minnesota state anti-dilution

---

[7] See supra pp. 17-18.

statute are also unlikely to succeed on the merits at this preliminary stage. See Minn. Stat. § 333.285(c)(2)(1998) (providing that noncommercial use is not actionable).

### 3. Unfair Business Practices

The Minnesota Unfair Business Practices statute applies only to persons "engage[d] in a deceptive trade practice ... in the course of business, vocation, or occupation...". Minn. Stat. § 325D.44 (1998). Since the court has already concluded that the defendant's actions and behavior in this matter do not at this stage indicate a commercial intent sufficient to satisfy infringement or dilution requisites, the court must also conclude that plaintiff is unlikely to succeed on its claim under this narrower statute.

### 4. The Anticybersquatting Consumer Protection Act

Congress passed the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(1)(A) (Supp. 2000) to protect "consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks--a practice commonly referred to as 'cybersquatting'." Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 495 (2d Cir. 2000) (quoting S. Rep. No. 106-140, at 4 (1999)).

To succeed on an ACPA claim a plaintiff must show that: (1) plaintiff's mark is distinctive or famous; (2) defendant's domain name is "identical or confusingly similar" to plaintiff's mark; and (3)defendant used, registered, or trafficked in the domain name with a bad faith intent to profit from the sale of the domain name. 15 U.S.C. § 1125(d)(1)(A). See also Sporty's Farm, 202 F.3d at 496-98 (describing elements of an ACPA claim); Harrord's Limited v. Sixty Internet Domain Names, 2000 WL 1175103, *1, __ F. Supp.2d __ (E.D. Va. Aug. 15, 2000) ("[T]he ACPA reflects Congress' intent to address the cybersquatting problem, not the innocent or good-faith registration of domain names that may infringe existing trademarks. ... [B]ad faith intent to profit is a necessary element...") (citing H.R. Conf. Rep. No. 106-464, (1999) ("The bill is carefully and narrowly tailored ... to extend only to cases where the plaintiff can demonstrate ... bad faith intent to profit ... Thus, the bill does not extend to ... someone who ... registers a domain name containing the mark for any reason other than with the bad faith intent to profit ...')). The ACPA protects both registered and common law trademarks. See Spear, Leeds and Kellogg v. Rosado, 2000 WL 310355, *1 (S.D.N.Y. Mar. 27, 2000).

While the first two elements are satisfied here, the last element, bad faith intent to profit, is not. Defendant does not appear to fit the "classic" cybersquatter profile, i.e. a person

who registers multiple domain names and attempts to sell them for the highest price obtainable. See Panvision Intern. L.P. v. Troeppen, 945 F. Supp. 1296, 1299 (C.D. Cal. 1996). Plaintiff, however, argues that an inference can be made that defendant's intent is to use this Internet domain name as leverage to extract a sum of money that will help compensate him for his perceived losses from the underlying insurance settlement. While this argument has some merit, at this preliminary stage of the litigation, this court cannot conclude that plaintiff is likely to prevail on the merits of an ACPA claim because the record does not sufficiently reflect a bad faith intent to *profit*.

The ACPA provides nine nonexclusive factors to assist a court in assessing whether the defendant had the requisite bad faith intent. 15 U.S.C. §1125(d)(1)(A)[8]; Broadbridge Media L.L.C. v.

---

[8] These nine factors are summarized as follows: (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark; (V) the person's intent to divert consumers from the mark owner's online location to a site that could harm the goodwill represented by the mark, either for commercial gain or to tarnish or disparage the mark by creating a likelihood of confusion as to source, sponsorship, or endorsement; (VI) the person's offer to sell or assign the mark for financial gain, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading or false contact information when applying to register the domain name; (VIII) the person's registration or acquisition of multiple domain names that are identical or confusingly similar to marks of others; (IX) the (continued...)

Hypercd.com, 106 F. Supp. 2d 505, 512 (S.D.N.Y. 2000) (noting that the "bad faith" list is not exclusive, and that the court may consider other factors relevant to finding bad faith intent to profit). While the first three factors support a finding of bad faith intent (defendant possessed no intellectual property rights in this domain name when he registered it, it is not defendant's legal name nor does it otherwise identify defendant, and defendant had not engaged in prior use of the domain name in connection with prior offering of goods or services), the court finds that the fourth factor, noncommercial use, strongly weighs in defendant's favor since there is no direct evidence of commercial use. Plaintiff argues that defendant has used this domain name for commercial purposes in that he ultimately seeks to sell it to plaintiff. The record, however, does not indicate any attempt to sell this domain name on defendant's part. Defendant has never expressly offered to sell the domain site to plaintiff and has never used the web site for anything other than commentary. The next two factors (intent to divert for commercial gain or to tarnish, and any offers to sell) weigh against a finding of bad faith because, while defendant admits he intends to attract Internet users interested in plaintiff's business, the record does not reflect that he does so for commercial purposes or to tarnish,

---

[8](...continued) extent to which the mark is or is not distinctive and famous. See 15 U.S.C. § 1125 (d)(1)(B)(i)(I) - (IX).

and the record does not reflect that defendant sought financial gain through an offer to sell this domain name. The next factor (provision of material misleading information) is inconclusive because, while defendant did falsely indicate that he represented a nonexistent entity named "North Land Insurance Company," defendant points out that this was not material since the actual contact information (i.e. registrant's address) was correct and defendant subsequently corrected the initially false information. The eighth factor (the registration of multiple domain names) does not apply to defendant here and thus does not support a finding of bad faith. In this regard, defendant does not fit the classic cybersquatter profile because there is no evidence that he has registered other variants of plaintiff's name or previously has registered other marks as domain names. Finally, plaintiff's trademark was distinctive and famous at the time defendant registered the domain name in 1999 for purposes of meeting the ninth factor.

Based upon these factors, the court concludes that the record does not establish that the defendant possessed the requisite bad faith intent to profit sufficient to establish the likelihood of success of plaintiff's claim under the ACPA warranting the issuance of injunctive relief. See 15 U.S.C. §1125(d)(1)(A) (Supp. 2000). While the evidence indicates that defendant has perhaps exhibited bad intent in setting up this web site to criticize plaintiff's

business practices, his "intent to profit," is not sufficiently discernable at this stage and presents an issue that seems best resolved by the trier of fact.

In summary, since the court cannot conclude that plaintiff is likely to succeed on the merits of any of its claims at this preliminary stage, a preliminary injunction is not warranted.

**D. The Public Interest**

The final Dataphase factor requires the court to consider the public interest. Dataphase, 640 F.2d at 114. Not surprisingly, both sides contend that the public interest supports their position. Plaintiff contends the public interest would be served by a preliminary injunction because undue confusion among Internet users who are seeking plaintiff's web site would be avoided. Plaintiff also points to the more general interests of deterring trademark infringement and protecting trademark rights from misuse on the Internet. While the public interest clearly demands that the Internet be used responsibly and in conformance with intellectual property laws, the right of defendant to openly express his viewpoint should likewise not be curtailed absent a clearer demonstration that the claims against him have merit. See Bally Total Fitness, 29 F. Supp. 2d at 1168 ("[t]he Internet is not without its growing pains. It is an efficient means for business to disseminate information, but it also affords critics of those

businesses an equally efficient means of disseminating commentary.").

Public policy requires that preliminary injunctions, especially those that stand to potentially chill a person's right to free speech, no matter how disagreeable that speech may be, should only be granted in the most extraordinary of circumstances and upon the most conclusive showing of all of the Dataphase elements.

Since factual questions surround whether defendant has intended to profit, whether his actions may imply a commercial use, and whether confusion among the Internet using public exists, the public interest is best served by preserving the status quo until the issues can be fully adjudicated. Nat'l Basketball Ass'n v. Minnesota Prof'l Basketball, Ltd. P'ship, 56 F.3d 866, 872 (8th Cir. 1995)(providing that primary purpose of a preliminary injunction is to preserve the status quo until the court reaches the merits and can grant full, effective relief if warranted). A preliminary injunction is an extra-ordinary remedy and absent a more discernable basis of both irreparable harm and the likelihood of success of plaintiff's claims on the merits, it cannot be issued at this stage.

For the reasons stated above, the court denies plaintiff's motion for a preliminary injunction.

**CONCLUSION**

Based on a review of the file, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's motion to dismiss for failure to state a claim is denied;

2. Plaintiff's motion for default judgment is denied; and

3. Plaintiff's motion for a preliminary injunction is denied.

Dated: September 25, 2000

David S. Doty, Judge
United States District Court